## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF PUERTO RICO

EMILY MARTINEZ ALVAREZ ET AL.,
  Plaintiffs,

                                   Civil No. 04-1579 (HL)

v.

DR. ARIEL BERMUDEZ VERA, ET AL.,
  Defendants.

## OPINION AND ORDER

Plaintiff Emily Martínez Alvarez ("Martínez") and her husband Erasmo Quiñones González bring this action against Dr. Ariel Bermúdez Vera, Dr. Miguel Meneses, Hospital Hermanos Meléndez, JDG Medical Corporation, P.S.C., Sindicato de Aseguradores para la Suscripción Conjunta de Seguros de Responsabilidad Profesional Médico-Hospitalaria (SIMED), and American International Insurance Company of Puerto Rico (AIICO) alleging violations of the Emergency Medical Treatment and Active Labor Act (EMTALA), Social Security Act, § 1867(a), as amended, 42 U.S.C. § 1395dd. Plaintiffs also seek to invoke this Court's supplemental jurisdiction over claims arising under Commonwealth of Puerto Rico law, specifically Articles 1802 and 1803 of the Civil Code of Puerto Rico, 31 L.P.R.A. §§ 5141& 5142. *See* 28 U.S.C. § 1367.

Pending before the Court is Defendants Hospital Hermanos Meléndez (the "hospital") and AIICO's  motion for summary judgment.[1] Plaintiffs filed an opposition[2] to said motion. Defendants move for summary judgment on the grounds that (1) the hospital, through its physicians and staff, screened and stabilized Martínez in accordance with EMTALA

---

[1]  Dkt. No. 45.

[2] Dkt. No. 54. Defendants filed a reply to Plaintiffs' opposition, however the reply was stricken from the record as untimely since it had been filed without leave from the Court or request for an extension of time over a month after the filing of Plaintiffs' opposition. *See* Order  Dkt. No. 58.

2

requirements and provided necessary and adequate medical treatment, and (2) this action is an artfully pleaded medical malpractice claim, brought improperly under EMTALA, that fails to establish a federal cause of action. For the reasons set forth below, the Court grants Defendants' motion for summary judgment.

**STANDARD OF REVIEW**

Under Rule 56(c) of the Federal Rules of Civil Procedure, the Court will grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of fact exists if there is sufficient evidence supporting the claimed factual dispute to require a choice between the parties' differing versions of the truth at trial. *LeBlanc v. Great Am. Ins. Co.,* 6 F.3d 836, 841 (1st Cir. 1993). A fact is material only if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining if a material fact is "genuine" the Court does not weigh the facts but, instead, ascertains whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. "The mere existence of a scintilla of evidence in support of the [nonmoving] party's position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Id.* at 252.

In deciding a motion for summary judgment, the Court shall review the record in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmovant's favor. *LeBlanc* at 841. The party moving for summary judgment bears the initial responsibility of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Once the moving party has satisfied the threshold requirement, the burden shifts to the nonmoving party to present facts that show there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Anderson* at 256. The nonmovant may not rest on mere conclusory allegations or wholesale denials. *See* Fed.R.Civ.P. 56(e); *Libertad v. Welch*, 53 F.3d 428, 435 (1st Cir. 1995). Furthermore, the nonmovant "must do more than simply show

that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

To aid the Court in the task of identifying genuine issues of material fact in the record, the District for Puerto Rico has adopted Local Rule 56 (formerly Local Rule 311.12). D.P.R. L.Civ.R 56(b)-(c). Local Rule 56(b) requires that a party moving for summary judgment submit in support of the motion, a separate, short, and concise statement of material facts as to which the moving party contends there is no genuine issue to be tried.  The moving party shall also provide the basis of such contention as to each material fact, properly supported by specific reference to the record. *Id.; see also Leary,* 58 F.3d at 751. Further, "[a] party opposing a motion for summary judgment shall submit with its opposition a separate, short and concise statement of material facts. The opposing statement shall admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts and unless a fact is admitted, shall support each denial or qualification by a record citation . . ." D.P.R. L.Civ.R 56(c).  The Court will only consider the facts alleged in the parties' Local Rule 56 statements when entertaining the movant's arguments. *Rivera v. Telefonica de Puerto Rico*, 913 F. Supp. 81, 85 (D.P.R. 1995). Where the party opposing summary judgment fails to comply with the rule's requirements, the district court is permitted to treat the moving party's statement of facts as uncontested. D.P.R. L.Civ.R 56(c); *Alsina-Ortiz v. Laboy*, 400 F.3d 77, 80 (1st Cir. 2005).

**FACTUAL BACKGROUND**

On August 13, 2003, due to the fact that plaintiff Emily Martínez Alvarez (hereinafter "Martínez") had been diagnosed with a cholelithiasis condition, Co-defendant Dr. Ariel Bermúdez issued admission orders for Martínez to undergo a laparoscopic cholecystectomy on August 18, 2003. Martínez and her husband both signed a consent form which indicated that Martínez was provided with information about alternative procedures to treat her condition and that Martínez elected the laparoscopic cholecystectomy. Martínez claims that she did not consent to undergo the procedure in an informed manner because the consent form did not

4

contain written information about the common risks of the laparoscopic procedure, additional surgical procedures which might have been necessary, or other information about the treatment and procedure proposed by Dr. Bermúdez.

On August 18, 2003, Dr. Bermúdez performed the laparoscopic cholecystectomy and found that Martínez had a dilated common bile duct and cholelithiasis. Subsequently, Martínez developed a high fever on August 20, 2003, and was kept at the hospital under observation until August 21, 2003. Prior to discharge Bermúdez entered a report that Martínez was stable and afebrile, and scheduled a follow-up appointment with Marínez for the following week. On a discharge summary dated August 21, 2003, Dr. Bermúdez reported that Martínez had recovered from the surgery. Martínez alleges that during the surgery Dr. Bermúdez transected her common bile duct and did not realize the damage that he had caused. Martínez also claims that Dr. Bermúdez did not perform any tests to determine the reason for her fever, and that she had symptoms of peritonits, severe pain, and a fever when she was discharged. Martínez suffered abdominal pain from August 22, 2003, through August 25, 2003.

On August 26, 2003, Martínez went to the Hospital Hermanos Meléndez emergency room because she was suffering severe abdominal pain. Martínez signed an authorization for treatment and was admitted to the emergency ward at 11:15 a.m. Laboratories and x-ray examinations were thereafter ordered. The results of the laboratories were received on August 26, 2003 at 12:30 p.m., 1:23 p.m., 1:41 p.m., and 2:40 p.m. Dr. Miguel Meneses evaluated Martínez and ordered multiple laboratory tests and medications. Dr. Meneses did not consult with Dr. Bermúdez until 4:00 p.m. Martínez was admitted to the Hospital Hermanos Meléndez by Dr. Bermúdez at 5:00 p.m. Dr. Bermúdez ordered laboratories and examinations, including an abdominal sonogram, and held a consultation with Dr. Rafael Solís. Martínez claims that when she was admitted to the Hospital she was exhibiting an elevated white blood cell count which was suggestive of peritonitis, but she was not immediately started on antibiotic treatment.

On August 27, 2003, Dr. Bermúdez performed tests to rule out his initial impression of an injury to Martínez's common bile duct. Additional laboratory results were received on

August 27, 2003, including the results of the abdominal sonogram. On August 27, 2003, Martínez was treated by Dr. Bermúdez who consulted with three other physicians. Dr. Rafael Solís ordered that Martínez continue receiving intravenous antibiotics, to rule out choledocholitiasis with cholestasis, and ordered Martínez transferred to Hospital San Pablo for an Endoscopic Retrograde Cholangiopancreatography (ERCP) exam. A consultation with a gastroenterologist was ordered and a HIDA scan was executed. The results of the HIDA or hepatobiliary scan were received on August 28, 2003, and revealed findings compatible with choledocholitiasis, suggesting an abdominal CT correlation and finding that the Martínez could be suffering from reflux of the stomach or a biliary leak.

At 2:00 p.m. on the following day, August 28, 2003, Martínez was examined by Dr. Bermúdez who reported that Martínez's problem was a bile leak and recommended that Martínez be transferred to Hospital San Pablo for the ERCP exam because Hospital Hermanos Meléndez did not have the equipment for this test. Martínez claims that this examination was unnecessary since Dr. Bermúdez had already asserted a positive diagnosis of injury to the common bile duct.  Martínez signed a Department of Emergency Room consent for transfer on August 28, 2006.  On August 29, 2003, Martínez was transferred to Hospital San Pablo and submitted to an ERCP exam. Martínez was thereafter admitted at Hospital San Pablo under the care of Dr. Bermúdez who performed a surgery to repair Martínez's bile duct injury on September 4, 2003. After the surgery Martínez was transferred to the intensive care unit of the hospital where she stayed for four days. On September 19, 2003, Martínez was discharged with altered liver enzymes, elevated bilirubin levels and suffering from pain. Martínez claims that she has experienced constant pain and discomfort since the laparoscopic surgery was performed.

## DISCUSSION

The Emergency Medical Treatment and Active Labor Act (EMTALA) was enacted in response to the increasing number of reports that hospital emergency rooms were refusing to accept or treat patients with emergency conditions when they did not have

6

insurance.  H.R. Rep. No. 241(I), 99th Cong., 1st Sess. 27 (1986).  It's purpose is to ensure all patients are treated fairly when they arrive in the emergency room of a participating hospital and that those needing treatment will not be turned away.  *Reynolds v. Maine General Health,* 218 F.3d 78, 83 (1st Cir. 2000)  "The avowed purpose of EMTALA was not to guarantee that all patients are properly diagnosed, or even to ensure that they receive adequate care, but instead to provide an 'adequate first response to a medical crisis' for all patients and 'send a clear signal to the hospital community...that all Americans, regardless of wealth or status, should know that a hospital will provide what services it can when they are truly in physical distress.'"  *Barber v. Hospital Corp. Of America,* 977 F.2d 872, 880 (4th Cir. 1992) (quoting 131 Cong. Rec. S13904 (Oct. 23, 1985) (statement of Sen. Durenberger)).  It is also clear that EMTALA does not create a federal cause of action for medical malpractice claims.  *Correa v. Hospital San Francisco,* 69 F.3d 1184, 1192 (1st Cir. 1995) "EMTALA is a limited 'anti-dumping' statute, not a federal malpractice suit." *Reynolds* at 83 (quoting *Bryan v. Rectors and Visitors of the Univ. Of Va.,* 95 F.3d 349, 351 (4th Cir. 1996).

Specifically, EMTALA includes three components: First, the statute contains a medical screening requirement, mandating participating hospitals to "provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition exists" to any individual who comes to the emergency department and requests examination or treatment. 42 U.S.C. § 1395dd(a).  Additionally, hospitals are required to provide necessary stabilizing treatment for emergency medical conditions and labor to any individual who comes to the hospital and who is determined to have an emergency medical condition.  42 U.S.C. § 1395dd(b).  Further, if an individual at a hospital has an emergency medical condition which has not been stabilized the hospital may not transfer the individual unless the patient makes an informed, written request for such transfer or the transfer is an "appropriate transfer".  42 U.S.C. § 1395dd(c).  An "appropriate transfer" is one in which (1) the

transferring hospital provides the medical treatment within its capacity which minimizes the risks to the individual's health; (2) the receiving facility has available space and qualified personnel for treatment and agrees to accept transfer; (3) the transferring hospital sends all medical records related to the individual's condition to the receiving facility; and (4) the transfer is effected through qualified personnel and transportation equipment. 42 U.S.C. § 1395dd(c)(2).

It is well-settled in this jurisdiction that EMTALA provides a cause of action against certain participating hospitals, but not against individual physicians. *Lebron v. Ashford Presbyterian Community Hosp.*, 995 F.Supp. 241 (D.P.R.1998). Accordingly, EMTALA claims against Dr. Ariel Bermudez-Vera and Dr. Miguel Meneses cannot be sustained. However, despite there being no independent federal jurisdiction over the individual physician co-defendants, the commonwealth claims pending against them are "so related to claims in the action within original jurisdiction that they form part of the same case and controversy." 28 U.S.C. § 1367. Hence pendent party jurisdiction allows them to remain in the action pending the outcome of this dispositive motion.

To establish an EMTALA violation, Plaintiffs must show (1) the hospital is a participating hospital, covered by EMTALA, that operates an emergency department; (2) the patient arrived at the facility seeing treatment; and (3) the hospital either did not afford the patient a proper screening in order to determine if an emergency medical condition existed or rejected the patient (whether by turning her away, discharging her, or improperly transferring her) without first stabilizing the emergency medical condition. *Correa* at 1190. The plaintiff need not prove she actually suffered from an emergency medical condition when she arrived at the hospital; the failure to screen is in itself sufficient to establish liability. *Id.*

As to Plaintiff's federal EMTALA claim, Plaintiff's allege that Hospital Hermanos Meléndez violated EMTALA in three instances: First, when they discharged Martínez on August 21, 2003 with an unstable medical emergency and without providing her further medical treatment and examination available at the hospital; Second, when they failed to

conduct an appropriate medical screening examination when Martínez arrived at the Hospital Hermanos Meléndez emergency room on August 26, 2003; and Third, when they transferred Martínez on August 29, 2003 to another hospital in an unstable state and without informing her of the risks involved. The Court will address each of these instances in turn.  As a threshold issue, the Court notes it is undisputed that Hospital Hermanos Melendez is a participating hospital, subject to EMTALA.

### I. Discharge on August 21, 2003

Plaintiffs' first claim the hospital discharged Martínez on August 21, 2003 without stabilizing her condition and without providing her with further medical treatment.  Martínez was admitted to the hospital following a previously scheduled elective laparoscopic cholecystectomy on August 18, 2006.  She remained in the hospital for treatment of complications from this operation until August 21, 2006.  It is undisputed that she received medical treatment during this time, though the quality of said treatment is now being challenged.  Nevertheless, a hospital's negligent or malfeasant care of a patient is not covered under EMTALA protections.  As numerous courts have often noted, including this one, EMTALA is an 'anti-dumping' statute, not a federal medical malpractice statute. *See* discussion *supra.* at p. 6.

The statute explicitly provides: "If any individual...comes to a hospital *and the hospital determines that the individual has an emergency medical condition,* the   hospital must provide...for such further medical examination and treatment...  42 U.S.C. § 1395dd(b) (emphasis added).  A hospital must have had actual knowledge of the individual's unstabilized emergency condition if an EMTALA claim is to succeed. S*ummers v. Baptist Medical Ctr. Arkadelphia,* 91 F.3d 1132, 1140 (8th Cir. 1996); *Urban v. King*, 43 F.3d 523, 525-26 (10th Cir. 1994).   "The Act does not hold hospitals accountable for failing to stabilize conditions of which they are not aware, or even conditions of which they should have been aware." *Vickers v. Nash General Hospital, Inc.*, 78 F.3d 139, 145 (4th Cir. 1996).

Here the hospital believed Martínez had been treated and was in recovery.  The treating physician, Dr. Bermúdez indicated on the discharge summary that the patient had recovered

from the surgery.  Dr. Bermúdez also reported that the patient was stable and afebrile in his discharge note (though the accuracy of this fact is disputed by Plaintiffs).  A post-admission discharge pursuant to a treating physician's instructions is not within the scope of the statute nor is it the behavior EMTALA was designed to target.   Plaintiffs' claim must fail because, under the express wording of the statute, subsection (b) of EMTALA only applies if the hospital knew an emergency condition existed. Such failures in diagnosing or treatment are better remedied under commonwealth medical malpractice law. *See Reynolds* at 83 (holding that the discharge from a hospital of an admitted patient who later died of a misdiagnosed condition was a malpractice claim and not an EMTALA violation). Accordingly, the discharge on August 21, 2003 does not qualify as an EMTALA violation.

## II.  Emergency Room Screening on August 26, 2003

Plaintiff next complains that the hospital failed to conduct a proper screening examination in the emergency ward when Martínez returned on August 26, 2003.  Specifically Plaintiffs object to the hospital's failure to perform abdominal x-rays or to provide immediate antibiotic treatment to Martínez when she presented with a fever, severe pain, elevated white blood cell count, and symptoms suggestive of peritonitis.  Though the statute calls for an "appropriate medical screening examination", it is silent as to what qualifies as "appropriate". 42 U.S.C. § 1395dd(a).  The First Circuit has elaborated, explaining:

> A hospital fulfills its statutory duty to screen patients in its emergency room if it provides for a screening examination reasonably calculated to identify critical medical systems that may be affecting symptomatic patients and provides that level of screening uniformly to all those who present substantially similar complaints...The essence of this requirement is that there be some screening procedure , and that it be administered even-handedly.

*Correa* at 1192.  Furthermore, "a hospital is not liable if it acts consistently with its customer screening procedure, even if said procedure would be inadequate under state malpractice law." *Rivera v. Doctors Ctr. Hosp., Inc.,* 247 F.Supp. 2d 90, 102 (D.P.R. 2003) (quoting *Jones v. Wake Cty. Comm. Hosp. Sys., Inc.,* 786 F.Supp. 538 (E.D.N.C. 1991)).

Martínez was provided an initial screening examination upon presentment.  Laboratory and x-ray tests were ordered soon after Martínez was admitted to the emergency ward at 11:15

a.m. on August 26, 2006. Results were received as early as 12:30 p.m. that day and continued to become available throughout the afternoon. At least two separate physicians were consulted regarding her condition and she was ultimately admitted to the hospital at 5:00 p.m. Additional tests were ordered over the next two days, including an abdominal sonogram and tests to rule out injury to the bile duct. On August 27, 2006 three additional physicians were consulted regarding Martínez's condition, Martínez was seen by a gastroenterologist, and a HIDA scan was conducted. The very fact Plaintiff was admitted to the hospital and received continuous treatment is prima facie evidence that screening was effectuated. *See Rivera* at 99; *Reynolds* at 83-84.

The second requirement, that such screening be administered even-handedly was also met. To recover for disparate treatment, Plaintiffs must provide evidence to show that Martínez received materially different screening than provided to others in her condition. *Reynolds* at 84. "It is not enough to proffer expert testimony as to what treatment *should* have been provided to a patient. *Id.* (Emphasis in original.) Plaintiffs fail to meet their burden as they have not showed that Martínez received materially different treatment from others in her same condition. EMTALA protects against differential treatment, not negligence. Thus "faulty screening, in a particular case, as opposed to disparate screening or refusing to screen at all, does not contravene the statute." *Correa,* at 1192-93. So long as a proper screening and evaluation is performed, EMTALA is not violated even if the result is a mis-diagnosis. *Rivera* at 101. There is no indication that the hospital did not follow its own protocol in this case. Allegations that a hospital emergency room staff was negligent is insufficient to state a claim for violation of EMTALA. As such, this alleged violation also lacks viability.

### III.  Transfer on August 29, 2003.

Finally, Plaintiffs aver the hospital acted improperly by transferring Martínez to another hospital on August 29, 2006 in an unstable condition and by failing to inform Martínez of the risks involved in the transfer. Further, Plaintiffs argue that the treating physician was negligent in effecting said transfer in that he should have known that the benefits of transfer did not outweigh the risks involved. The duty to stabilize patients with emergency conditions and the

11

process of transferring them are set forth in subsections (b) and (c) of EMTALA.  If an emergency condition is detected during screening, then the hospital must either provide further medical treatment required to stabilize the patient or transfer the patient to another hospital in accordance with subsection (c).  42 U.S.C. 1395dd(b)(1).  An emergency condition is defined as "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in--(i) placing the health of the individual...in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part.  42 U.S.C. 1395dd(e)(1).

In the instant matter, Martínez presented with an emergency condition and the hospital knew of this condition.   The question therefore is whether Martínez was stable at the time of her transfer. The statute defines "stabilized" as meaning "that no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility."  42 U.S.C. 1395dd(e)(3)(B).  Under the statute stabilized patients may be transferred without limitations.  *Rivera* at 104.  Thus, to prove a transfer violation under EMTALA, "Plaintiff must show not only that the patient was not stabilized and was not accepted by the receiving hospital, but also that the doctor knew or should have known that risks of transfer outweighed the benefits."  *Id.* (quoting *Cherukuri v. Shalala*, 175 F.3d 446, 450 (6th Cir. 1999).   The Court must consider whether the transfer was reasonable in light of the circumstances that existed at the time of transfer and at the time the diagnosis was made.  *Id.*

Although the Hospital contends that Martínez was stable at the time of her transfer, it argues alternatively that even if Martínez was not stable, she was properly transferred pursuant to the EMTALA requirements.  A hospital may transfer an unstable patient with an emergency condition if the patient or a legal representative gives informed consent or if a physician certifies that the anticipated benefits outweigh the risks of transfer. *Rivera* at 104; 42 U.S.C. 1395dd(c)(1).

In this case Martínez was transferred to a nearby hospital in order to undergo an ERCP

12

test which was not available at Hospital Hermanos Melendez.  The receiving hospital was less than five minutes away. Furthermore, Martínez was transferred under the care of the same doctor, Dr. Bermúdez, who treated her at Hospital Hermanos Melendez.  Dr. Bermúdez also assumed primary physician duties at the receiving hospital and eventually performed the surgery on Martínez at that hospital.  It appears from the record that Martínez was indeed stable at the time of transfer.  She had been admitted to the transferring hospital for 3 days prior to the transfer, and remained at the receiving hospital for 6 days after transfer but prior to her surgery. There is no indication that her condition worsened in any way during this time. Plaintiff also provides no evidence to show that Dr. Bermúdez anticipated, or should have anticipated, a deterioration in her condition due to the transfer.  As such, the statutory definition of a "stabilized" condition has been met.  Said transfer does not violate EMTALA safeguards.

Notwithstanding, even if the Court accepts that Martínez's condition was not stable at the time of transfer, the evidence shows that Dr. Bermúdez believed the benefits of transfer (namely the availability of an ERCP diagnostic test) outweighed the risks.  The statute requires a physician to sign a certification that based on the information available at the time of transfer, the medical benefits reasonably expected outweigh the risks to the patient.  42 U.S.C. 1395dd(c)(1)(A)(ii).  On the Transfer Form, Dr. Bermúdez indicated as a benefit that "Patient can be evaluated with ERCP".  He left blank the space for indicating risks.  The Court finds this sufficient to show the doctor had considered the totality of circumstances and found the benefits as indicated outweighed the risks, if any.  The statutory requirements have been met. *See Vargas by & Through Gallardo v. Del Puerto Hosp.,* 98 F.3d 1202, 1205 (9th Cir. 1996) (holding that a hospital cannot become liable under EMTALA for what amounts to a clerical deficiency in record keeping where evidence indicates that the transfer was effected for medical reasons).  "It is the failure to undertake that assessment [weighing the risks and benefits] that results in EMTALA liability, not merely the partial failure to summarize the risks and benefits in writing."  *Vargas* at 1205.  Hence the conditions necessary to effectuate a proper transfer of an unstable patient were also met. Plaintiffs's final EMTALA claims is

13

without merit.

## CONCLUSION

In view of the aforementioned, the Court hereby **GRANTS** Defendants' motion for summary judgment.  Plaintiff's EMTALA claims are hereby **dismissed with prejudice**. All claims over which the Court had original jurisdiction having been dismissed, the Court declines to exercise supplemental jurisdiction over Plaintiffs' commonwealth claims.  *See* 28 U.S.C. § 1367(c)(3). As such, the commonwealth claims are hereby **dismissed without prejudice**.  Judgment shall be entered accordingly.


**IT IS SO ORDERED.**

San Juan, Puerto Rico, September 29, 2006


S/ HECTOR M. LAFFITTE
Senior United States District Judge